**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

TRAVIS SHINNEMAN

                Plaintiff

v.                                                      CASE NO. 1:21-cv-2203-JMS-TAB

INDIANAPOLIS-MARION COUNTY
CITY-COUNTY COUNCIL, et al.

                Defendants

**TRAVIS SHINNEMAN'S MEMORANDUM IN OPPOSITION TO**
**CITY-COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Travis Shinneman, by and through the undersigned counsel, and files this *Memorandum in Opposition to City-County Defendants' Motion for Summary Judgment* pursuant to Fed. R. Civ. P. 56.

**I.      Shinneman's Statement of Undisputed Facts**

**A.      In Custody at Time of Injury**

Experts have concluded that Mr. Shinneman was handcuffed and in law enforcement custody at the time his injury occurred. [Filing No. 128-1 at 6. (**Ex. A**, Declaration of George Nichols, MD ("Nichols Dec."), Ex. 1, Nichols Report p. 3); Filing No. 128-2 at 13. (**Ex. B**, Declaration of Chris Van Ee, PhD ("Van Ee Dec."), Ex. 1, Van Ee Report p. 10); Filing No. 128-3 at 8. (**Ex. C**, Report of Lisa Gwin, DO ("Gwin Report") p. 7)].[1]

Plaintiff's expert, Dr. George Nichols, concluded the injury resulted from "an impact [which] occurred to Travis Shinneman while either being placed in the van or while in transit in

---

[1] The Exhibits relied upon in support of Mr. Shinneman's Motion for Summary Judgment on Liability and his Opposition to the MCSO Defendants' Motion for Summary Judgment [Dkt. 113] are identical to those offered in opposition to the City-County Defendants' Motion for Summary Judgment [Dkt. 117]. As such, a single designation of evidence is being made in support of or opposition to those three filings respectively.

the van." [Filing No. 128-1 at 6. (Nichols Dec., Ex. 1, p. 3).]  Plaintiff's expert Dr. Chris Van Ee concluded, "it is likely that Mr. Shinneman sustained his traumatic cervical spine and cord injury after being placed in the wagon." [Filing No. 128-2 at 13. (Van Ee Dec., Ex. 1, p. 10)].  And finally, Defendants' expert, Dr. Lisa Gwin, reported, "I agree with Dr. Nichols that Mr. Shinneman received his injuries when being placed into the van as described by Deputy Monday." [Filing No. 128-3 at 7. (Gwin Report, p. 6)].  Dr. Gwin concluded, "Mr. Shinneman's cervical injuries were due to neck flexion" and "Deputy Monday … provided the neck flexion." [Filing No. 128-3 at 8. (Gwin Report, p. 7)].

### B.   Governmental Entities

Defendant Indianapolis-Marion County is a consolidated city as contemplated by the laws of Indiana and is governed by an executive and legislative body. Ind. Code Ann. §36-3-1-0.3, *et al*.  On April 22, 2015, Indianapolis Metropolitan Police Department ("IMPD") General Order 8.1 entitled *"Prisoner Handling, Transportation and Escape"* went into effect and stated at (I)(F) that, "[p]risoners will be transported by MCSO jail wagons."[2] [Filing No. 128-4 at 2-10. (**Ex. D**, IMPD General Order 8.1 ("IMPD G.O. 8.1")].

Defendant Marion County Sheriff's Office ("MCSO") is an autonomous governmental entity in Marion County established under the laws of Indiana to provide law enforcement services for the people of Indianapolis and Marion County, including but not limited to, providing transport of arrestees, General Order 16.3 entitled *"Prisoner Handling, Transportation & Escape."*[3] [Filing No. 128-5 at 2-11. (**Ex. E**, MCSO General Order 16.3 ("MCSO G.O. 16.3")].

---

[2] IMPD G.O. 8.1 was in effect on September 8, 2019.
[3] MCSO G.O. 16.3 was in effect on September 8, 2019.

### C.      Events of Mr. Shinneman's Arrest

On September 8, 2019, IMPD officers were dispatched to 2720 Southeastern Avenue, in Indianapolis at approximately 1430 hours to investigate "a trouble with person." [Filing No. 128-6 at 2. (**Ex. F**, Probable Cause Affidavit ("PCA")]. Terry Smith was the first officer to the scene, followed by Theodore Brink, Joshua Brown, and Brian Linares. [Filing No. 128-7 at 2-7. (**Ex. G**, Incident Detailed Report, ("IDR") at p. 1)].

The officers observed Mr. Shinneman walking in the street and yelling. [Filing No. 128-6. (PCA)]. Linares and Smith informed Mr. Shinneman to quiet down or he would be arrested for disorderly conduct. [Filing No. 128-6. (PCA)]. It was suspected that Mr. Shinneman was intoxicated. [Filing No. 128-6. (PCA)]. Mr. Shinneman continued to yell; as such, he was arrested, and placed in custody for disorderly conduct and public intoxication. [Filing No. 128-6. (PCA)].

Per the dictates of IMPD G.O. 8.1, Smith requested an MCSO transport wagon. [Filing No. 128-6. (PCA)]. Brink, Brown, Linares, and Smith were present when Mr. Shinneman was arrested. [Filing No. 128-7 at 2. (IDR at 1)].

The Defendant officers and deputy gave sworn statements to the MCSO and/or IMPD Internal Affairs Departments,[4] respectfully:

1.  Deputy Monday, dated September 10, 2019 [Filing No. 128-8. (**Ex. H**, Transcript of Deputy Steve Monday's Oral Statement ("Monday Oral Stmt.")].
2.  Officer Linares, dated September 18, 2019 [Filing No. 128-9. (**Ex. I**, Transcript of Officer Brian Linares' Statement ("Linares Stmt.")].
3.  Officer Smith, dated September 18, 2019 [Filing No. 128-10. (**Ex. J**, Transcript of Officer Terry Smith's Statement ("Smith Stmt.")].

---

[4] It should be noted that the City-County and IMPD Defendants motion relies on the four (4) IMPD Defendants' declarations which merely contain identical conclusory assertions in the same format. The sworn statements given to the MCSO and/or IMPD Internal Affairs Departments are never mentioned. Dkt. 118.

4.  Officer Brink, dated September 19, 2019 [Filing No. 128-11. (**Ex. K**, Transcript of Officer Theodore Brink's Statement ("Brink Stmt.")].

5.  Officer Brown, dated September 19, 2019 [Filing No. 128-12. (**Ex. L**, Transcript of Officer Joshua Brown's Statement ("Brown Stmt.")].

In addition, Monday drafted a written statement that was produced in discovery.  [Filing No. 128-13. (**Ex. M**, Written Statement of Deputy Steve Monday ("Monday Written Stmt.")].[5]

"Brown and [Linares] put handcuffs on [Shinneman] to detain him.  He didn't resist, he didn't do anything.  He just gave up -- gave his hands up to us."  [Filing No. 128-9 at 8. (Linares Stmt. 6:2-5)].  Linares reiterated that Mr. Shinneman did not resist while being handcuffed by IMPD. [Filing No. 128-9 at 12. (Linares Stmt. 10:12-16)].  Brown explained, "I was the one that sat him down, but it wasn't -- there wasn't any resistant behavior." [Filing No. 128-12. at 9 (Brown Stmt. 7:25-8:2)].  Brink testified that Mr. Shinneman did not resist while IMPD handcuffed him. [Filing No. 128-11 at 24. (Brink Stmt. 22:5-7)].

At 1447 hours, Monday arrived to transport Mr. Shinneman to the jail. [Filing No. 128-7at 2. (IDR at 1)].  According to Monday, Mr. Shinneman walked "about 25, 30 feet" to the jail wagon with "minimal to no assistance from IMPD Officers." [Filing No. 128-8 at 7. (Monday Oral Stmt. 5:20-6:8)].  Monday placed his cuffs on Mr. Shinneman and returned the IMPD's cuffs to the arresting officers. [Filing No. 128-8 at 8. (Monday Oral Stmt. 6:17-19)].

The MCSO jail wagons are not equipped with GPS devices or lap belts/3-point seat belts. Dkt. 116, p. 7 Page ID# 1319.  All Defendants in this matter admit that there is a risk of bodily injury of any severity including death when an individual riding in a motor vehicle is unrestrained or otherwise protected by any safety feature, including but not limited to a seatbelt.

---

[5] Mr. Shinneman does not dispute the fact that Monday provided a written statement and a sworn oral statement to MCSO IAD and Brink, Brown, Linares and Smith provided sworn oral statements to IMPD IAD. However, he recognizes there are factual discrepancies among the statements.

[Filing No. 128-14 at 3. (**Ex. N**, MCSO's Response to Plaintiff's Request for Admissions ("MCSO Resp. R for A"), Req. No. 5); Filing No. 128-15 at 3-4. (**Ex. O**, Deputy Steve Monday's Response to Plaintiff's Request for Admissions ("Monday Resp. R for A"), Req. No. 6); [Filing No. 128-31 at 3. (**Ex. EE**, City-County Response to Plaintiff's Request for Admissions ("City-County Resp. R for A"), Req. No. 4)].

On September 9, 2019, the Marion County Prosecutor's Office filed disorderly conduct charges against Mr. Shinneman, he was not charged with public intoxication nor resisting arrest. [Filing No. 128-16. (**Ex. P**, Information in Case No. 49G10-1909-CM-035499 ("Info")].  On October 1, 2020, the State of Indiana dismissed the disorderly conduct charge against Mr. Shinneman. [Filing No. 128-17. (**Ex. Q**, Dismissal of Case No. 49G10-1909-CM-035499)].

### D.      Entry Into Transport Vehicle

Monday claims Mr. Shinneman entered the transport wagon by attempting a backward somersault.  [Filing No. 128-8 at 18. (Monday Oral Stmt. 16:4-12)].   Monday testified that he did not get into the transport wagon, he merely adjusted Mr. Shinneman using his "long arms" from a position standing on the ground.  [Filing No. 128-8 at 24. (Monday Oral Stmt. 22:13-16)]. Lastly, Monday stated that he was not touching Mr. Shinneman during the alleged backward somersault, he reached into the wagon and lifted Mr. Shinneman's shoulders. [Filing No. 128-8 at 24. (Monday Oral Stmt. 22:13-16)].

None of the IMPD Defendants described any backward somersault.  Brink saw Monday push Mr. Shinneman into the wagon "headfirst," "then all of Monday [got] into the back of this wagon" and then manipulated him to be "laying down stomach-wise."  [Filing No. 128-11 at 17. (Brink Stmt. 15:6-13)]. [Filing No. 128-11 at 17. (Brink Stmt. 15:5-13)].  Brown witnessed Monday "push [Mr. Shinneman] forward while grabbing his arm."  [Filing No. 128-12 at 28.

(Brown Stmt. 26:9-10)].  Then, "Deputy Monday got into the back of the van."  [Filing No. 128-12 at 12. (Brown Stmt. 10:25)].  Brown saw Mr. Shinneman "sitting on his butt on the floor pan, facing forward, and he was sitting upright hands behind his back.  And that is how I know the deputy to have left him." [Filing No. 128-12 at 13. (Brown Stmt. 11:7-10)].  Linares explained "[Monday] forced him in there.  He said – deputy's a big guy, and he just grabbed him like in the back and took him inside." [Filing No. 128-9 at 16. (Linares Stmt. 14:17-21)].

### E.    Shinneman Resistance & Monday's Frustration

Monday stated, "[s]o, I kept telling him to, 'Step up, step in, step up, step in, get in, come on, get in, come on, get in.' I mean, I said this, I mean, a million times, literally.  I just kept saying it over and over, 'Step up'." [Filing No. 128-8 at 9-10. (Monday Oral Stmt. 7:25-8:4)].

Monday explained that Mr. Shinneman's behavior did not warrant the use of "any type of other force, you know, taser or pepper spray.  The situation didn't call for it." [Filing No. 128-8 at 13. (Monday Oral Stmt. 11:5-8)].  Monday stated, "I mean, we had verbal directives forever, officer presence forever, you know?  No -- no use of force as far as, you know, tasers or anything to that nature, pepper spray or whatnot, or kicks or strikes, you know, around the public eye.  I mean, I'm not going to manhandle a drunk like that with -- in handcuffs."  [Filing No. 128-8 at 13. (Monday Oral Stmt. 11:15-22)].

While enroute to the jail, Monday "called intake and advised them that [he] had a resister and [] would need assistance getting him out of the wagon." [Filing No. 128-13 at 3. (Monday Written Stmt., 2:47-48); Filing No. 128-8 at 16. (Monday Oral Stmt. 14:5-13)].

Brown testified about Mr. Shinneman's demeanor after MCSO took over the arrest, Mr. Shinneman had "plateaued. … Like he'd reached his peak disobedience, I guess, after he'd been sat down.  He was still verbally abusive after we got there, but there was never an escalation on

[Shinneman's] part." [Filing No. 128-12 at 26. (Brown Stmt. 24:8-14).]  He described Mr.

Shinneman's actions as "complete passive resistance" that lasted "at least eight minutes." [Filing

No. 128-12 at 28. (Brown Stmt. 26:3-5)].  Brown explained that Mr. Shinneman never kicked or

actively resisted.  [Filing No. 128-12 at 26. (Brown Stmt. 24:19-22)].

Brink described Mr. Shinneman, "[l]ike I said, he was not – he was not a resistor, he was

just a mouthy guy." [Filing No.128-11 at 26. (Brink Stmt. 24:7-8)].  Brink also spoke to IMPD

Commander Ron Hicks. [Filing No. 128-18. (**Ex. R**, Commander Ronald Hicks Email Chain

("Hicks Email")].  Com. Hicks emailed Deputy Chief Joshua Barker that "FTO Brink said the

wagon driver was clearly getting frustrated and agitated with Shinneman." [Filing No. 128-18 at

3. (Hicks Email, p. 2)].

## II.     Shinneman's Disputes as to City-County Defendants' Undisputed Facts

### A.  Shinneman's recollection

In City-County Defendants' Brief, it is asserted that "Mr. Shinneman has no memory of

the events that occurred September 8, 2019." Dkt. 118, p. 12, Page ID#1472.  On September 11,

2019, three (3) days after his injury, Lt. Ron Knight with the MCSO IAD interviewed Mr.

Shinneman in his hospital bed. [Filing No. 128-24 at 2-3. (Shinneman Dec., ¶5)].  During that

contemporaneous interview, and in response to Mr. Shinneman's present recollection, he

explained that he was thrown headfirst into the wagon. [Filing No. 128-24 at 6. (Shinneman

Dec., Ex. 1 (Shinneman's Hospital Statement) 2:41-44)].  He further recalled "I was trying to get

my knees up on it so I could climb in it and evidently I wasn't fast enough for them … so they

literally picked me up one on each side of me and threw me in there."  [Filing No. 128-24 at 6.

(Shinneman Dec., Ex. 1, 2:45-49)].  On that date, Mr. Shinneman "distinctly" remembered that

two (2) officers threw him into the wagon. [Filing No. 128-24 at 7. (Shinneman Dec., Ex. 1,

3:69-70)].  Mr. Shinneman had no recollection of anything after being thrown into the wagon.

[Filing No. 128-24 at 7. (Shinneman Dec., Ex. 1, 3:80-81 & 94-95)].

        Mr. Shinneman was not deposed by the defendants until February 24, 2022, 2 ½ years

after he suffered his injury while in police custody.  [Filing No. 128-24 at 3. (Shinneman Dec.

¶9)].

        Beth Wolford (Travis Shinneman's mother) was deposed and questioned about her son's

memory of events and his psychological testing while at the Veteran's Administration Medical

Center, Hines, Illinois, "[h]e was definitely affected, you know, short-term memory.  His

executive skills, they call it, were okay.  But they said, you know, we don't know whether these

things will get getter or not because there was some brain damage from this; so …." [Filing No.

128-25 at 7. (**Ex. Y**, Deposition of Beth Wolford (Wolford Depo."), 43:1-5).]  Ms. Wolford was

further questioned:

> Q.  How else is Travis different?
> A.  Being able to concentrate.  He's all over the place.  He still -- he tries really hard.  He
> still -- he wants to do things.  He would love to have a job.  But at this point I don't think
> that probably will be an option.  He can't remember.
> Q.  So his memory has been affected?
> A.  Oh, greatly, yeah.
> Q.  So his ability to concentrate has been affected negatively and his memory?
> A.  Uh-huh [indicating 'yes.'].
> [Filing No. 128-25 at 7. (Wolford Depo., 43:21-44:6).]

        Further, while a patient at the VAMC in Hines, Illinois, Mr. Shinneman was assessed in a

Neuropsychological Evaluation on October 15, 2019. [Filing No. 128-26 at 2-6. (**Ex. Z**, Selected

Hines Hospital Records)].  The physician noted Mr. Shinneman's recollection of events from

September 8, 2019: "'I remember them cuffing my ankles and wrists and tying them behind my

back and telling me to get in the paddy wagon and was then roughly thrown into the vehicle.'"

[Filing No. 128-26 at 6. (VAMC Hines)].

February 24, 2022, Mr. Shinneman was deposed.  [Filing No. 128-24 at 3. (Shinneman

Dec. ¶9)].  During his deposition, due to his memory loss, he could not recall the events of

September 8, 2019; however, Mr. Shinneman *has offered* medical and scientific evidence as to

his injury mechanism.  [Filing No. 128-1. (Nichols Dec., Ex., 1); Filing No. 128-2. (Van Ee

Dec., Ex. 1)].

### B.  Mr. Shinneman's arrest

Mr. Shinneman was not an active resister; to the contrary, every IMPD Defendant states

the opposite:

1. Brink reiterated, "[l]ike I said, he was not – he was not a resistor, he was just a mouthy
   guy." [Filing No. 128-11 at 26. (Brink Stmt. 24:7-8)].
2.  Brown described Mr. Shinneman's actions as "complete passive resistance." [Filing No.
   128-12 at 28. (Brown Stmt. 26:3-4)].
3. Linares stated "[Shinneman] didn't resist, he didn't do anything.  He just gave up -- gave
   his hands up to us."  [Filing No. 128-9 at 8. (Linares Stmt. 6:3-5)].

### C.  Mr. Shinneman's arrival at the Marion County Jail

The City-County Defendants were not present at the Marion County Jail.  It is unclear

why they are defending the actions of Nurse Brooklyn Vise; however, Mr. Shinneman disputes

Vise's assertions in her declaration, and the actual videos from the Marion County Jail

completely discredit several points made in the City-County Defendants' Brief based on Vise's

declaration.  Dkt. 118, at 11, 12 PageID # 1471, 1472. [Filing No. 128-20. (**Ex. T**, 3 Videos from

the Marion County Jail ("Videos"), Ex. 1, REC. SLATE_on_LOCK UP BASEMENT video,

Bates MCSO_003714; Ex. 2, Intake Entry video, Bates MCSO_003715; Ex. 3, Property Counter

video, Bates MCSO_003716)].

1. Vise claims she "first saw Travis Shinneman at Jail Intake." [Filing No. 128-28 at 2. (**Ex.
   BB**, Affidavit of Nurse Brooklyn Vise, ("Vise Aff.") ¶4)].  The videos evidence that Vise
   did not enter the Property Counter Room (which is not the Intake Entry room) until after

9

the deputies wheeled Mr. Shinneman into the Property Counter room – thus she did not 'examine' Mr. Shinneman prior to the video. [Filing No. 128-20. (Videos, Ex. 1)].

2. The sequence and possible order of events listed in Vise's declaration are not evidenced on the videos.  [Filing No. 128-28 at 2. (Vise Aff.) ¶¶4-7)].  The videos evidence that Vise did not speak with Mr. Shinneman in the Property Counter room – she was talking and laughing with deputies while Mr. Shinneman was being handled by the deputies. [Filing No. 128-20. (Videos, Ex. 1);.

3. It is undisputed that Vise "observed several jail deputies in the property room attempting to get Mr. Shinneman to stand;" however, it is disputed that Mr. Shinneman "would not" stand – if Vise were paying attention (and not yucking it up with the deputies) she would have observed Mr. Shinneman's legs dangling under his body, curled. [Filing No. 128-28 at 2. (Vise Aff.) ¶¶7); Filing No. 128-20. (Videos, Ex. 1 & 3)].  Further, Mr. Shinneman was not *able* to stand because he was paralyzed. [Filing No.128-23 at 3. (**Ex. W**, Selected Eskenazi Hospital Records, ("Esk. Hos. Rec.")].

4. The video depicts Sgt. Bettis pointing his finger to the sky in a repeated movement, which was also observed by Vise.  [Filing No. 128-20. (Videos, Ex. 1)].

5. Vise could not have witnessed Mr. Shinneman being "wheeled back to the receiving area and laid on the ground to wait for the ambulance" because that did not occur.  [Filing No. 128-28 at 3. (Vise Aff.) ¶10)].  In fact, quite the opposite, the video evidences Vise watched the wheelchair (empty) pass by her, while she witnessed Mr. Shinneman being carried out 'hog-style' with 4 deputies (each carrying a limb) stomach toward the ground. [Filing No. 128-20. (Videos, Ex. 1)].  Vise followed the crew of men carrying Mr. Shinneman back into the Intake Entry room.

6. Vise did not witness Mr. Shinneman "being uncooperative and trying to get out of the wheelchair with his upper body" and subsequently laid on the floor for his safety. [Filing No. 128-28 at 3. (Vise Aff.) ¶10)]. After his "pat-down" he was **not in the wheelchair – he was carried 'hog-style'** stomach toward the floor, back to the Intake Entry room. [Filing No. 128-20. (Videos, Ex. 1)].

7. Vise claimed in her declaration, "I *again* asked Mr. Shinneman if he was in pain, and this time he told me his left arm hurt, and that it was tight." (Emphasis added) [Filing No. 128-20 at 4. (Vise Aff. ¶15)]. The videos only evidence one (1) conversation with Mr. Shinneman and that occurred in the Intake Entry room – while waiting for EMS. [Filing No. 128-20. (Videos, Ex. 1, 2 & 3)].

Nurse Vise refused to admit Mr. Shinneman to the jail citing "etoh intox." [Filing No. 128-21. (**Ex. U**, "Man Down" Response Form ("Man Down")]. The form mentioned that Mr. Shinneman "took ASA prior to arrest;" however, the form was devoid of any assertion that Mr. Shinneman's "left arm hurt, and that it was tight." [Filing No. 128-21. "Man Down"); Filing No. 128-28 at 4. (Vise Aff. ¶15)].

### D. Expert opinions

Again, the City-County Defendants are mischaracterizing the evidence. Dr. Van Ee never claimed or "believe[d] that Mr. Shinneman did not have a cervical spine injury when the doors to the jail transport wagon were shut and getting Mr. Shinneman into the wagon is not when Mr. Shinneman's injury occurred." Dkt. 118, at 13 PageID # 1473. As his testimony related to Dr. Gwin's theory that a backward somersault could cause the bilateral facet dislocation that Mr. Shinneman suffered, he stated: "I know of no case study and no biomechanical support for the idea that just a backwards somersault on the ground would ever

11

give this [bilateral facet dislocation injury] to anybody." [Filing No. 128-2 at 42. (Van Ee Dec.,

Ex. 2 (Van Ee Deposition) 38:3-6)]. Dr. Van Ee consulted three additional colleagues regarding

Dr. Gwin's opinion of the injury mechanism. [Filing No. 128-2 at 33. (Van Ee Dec., Ex. 2,

17:22)]. Dr. Van Ee specifically questioned if any had heard of a backward somersault causing a

bilateral facet dislocation. [Filing No. 128-2 at 34. (Van Ee Dec., Ex. 2, 18:17-19)]. His

colleagues responded with negative results citing that there was no biomechanical support for

such a finding. [Filing No. 128-2 at 34. (Van Ee Dec., Ex. 2, 18:20)].

Dr. Van Ee testified that the alleged factual premise (Monday's version of events) upon

which Dr. Gwin based her theory of the injury mechanism, is not biomechanically possible,

citing that in the moment that Mr. Shinneman allegedly attempted a backward somersault,

Monday testified that he was not touching Mr. Shinneman. [Filing No. 128-2 at 52-55. (Van Ee

Dec., Ex. 2, 60:22-63:15)]. Dr. Van Ee explained that tremendous force/compression would be

required to sustain a bilateral facet dislocation and because of Monday's assertion that he was

not in the van, the biomechanical force necessary cannot be generated. [Filing No. 128-2 at 55.

(Van Ee Dec., Ex. 2, 63:8-16)]. Further, Dr. Van Ee was queried as to the amount of force that

would have been necessary to cause the injury sustained by Mr. Shinneman:

> But if [Monday] pushes down on him, that's not what he said he did, but then you might
> have something that's getting at least along the lines of what Dr. Gwin has hypothesized
> where you have perpetrator who's actually pushing on somebody who's in a
> compromised position and that perpetrator then is the driving factor that breaks the spine
> on this person. And if you're pushing on somebody when their neck is bent, that's –
> that's a -- to me, that is an open and obvious and horrible thing to do.
> [Filing No. 128-2 at 42. (Van Ee Dec., Ex. 2, 38:15-24)].

Dr. Van Ee continued with further explanation that the perpetrator's (Monday's) actions

would have been obvious to the him (Monday):

> But if somebody is bent down and you're shoving them further into the ground and
> compressing that neck further, I'm not sure if you get this injury, but if you did, it should

be obvious to the person shoving that person down, which is not what Deputy Monday said, that they are compromising that person and putting them in grave danger. [Filing No. 128-2 at 43. (Van Ee Dec., Ex. 2, 39:1-7)].

Dr. Van Ee was provided hypothetical scenarios to contemplate, such as whether Mr. Shinneman's injury could have occurred because he was "resisting," to which Dr. Van Ee responded, "I don't have any evidence of that.  I don't even --Deputy Monday didn't say anything about that." [Filing No. 128-2 at 56. (Van Ee Dec., Ex. 2, 64:3-4)].  Further, in the series of scenarios to which Dr. Van Ee was asked to speculate, "[s]o, I mean, Mr. Shinneman could get away and jump off the back of the -- and dive head first onto the concrete and get this injury.  Again, I don't have evidence of that either." [Filing No. 128-2 at 56. (Van Ee Dec., Ex. 2, 64:4-8)].

### III.     Law and Argument

### Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A material fact is one that 'might affect the outcome of the suit[.]'" *Williams v. Brooks*, 809 F.3d 936, 941 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

The moving party cannot rest its case on the pleadings, rather, they bear the burden to demonstrate, using, specific factual allegations, that there is no genuine issue of material fact that requires a trial. *Celotex*, 477 U.S. at 324. Once the moving party presents their motion and supporting facts, the burden shifts to the non-moving party to present evidence of specific facts

showing that a genuine issue exists for trial. *Celotex Corp.,* 477 U.S. at 323.  The court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 158-59 (1970); *Landgrebe Motor Transp., Inc. v. District 72, Int'l Assoc. of Machinists*, 763 F.2d 241, 244 (7th Cir. 1985). The non-movant gets the benefit of the doubt "only if the record contains competent evidence on both sides of a factual question." *Patel v. Allstate Ins. Co*., 105 F.3d 365, 367 (7th Cir.1997).

### 42 U.S.C. §1983 Analysis

*Kingsley* addressed a detainee's claim of Fourteenth Amendment due process right violations by the use of excessive force. *Kingsley v. Hendrickson,* 576 U.S. 389, 401 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015).  In doing so the Court held "that a pretrial detainee bringing an excessive-force claim did not need to prove that the defendant was substantially aware that the amount of force being used was unreasonable. (Citation omitted.) Rather, the plaintiff needed only to show that the defendant's conduct was objectively unreasonable. (Citation omitted.)" *Miranda v. Cty. of Lake*, 900 F.3d 335, 351 (7th Cir. 2018).

**Mr. Shinneman's injury occurred while he was in the custody of law enforcement.**

On September 8, 2019, Brink, Brown, Linares, and Smith ("IMPD Defendants") arrested Mr. Shinneman for disorderly conduct and public intoxication.  The IMPD Defendants handcuffed Mr. Shinneman and called MCSO to transport him to the Marion County Jail. [Filing No. 128-4. (IMPD G.O. 8.1)].

It is well settled that when law enforcement takes a person into custody, and holds them against their will, they assume a constitutional duty to provide for the person's safety and well-being in light of the special relationship between the law enforcement entity and the person. *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 199–200, 109

14

S.Ct. 998, 103 L.Ed.2d 249 (1989), *Proffitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002).  The

Seventh Circuit has explained that a special relationship arises "from the limitations that the state

has imposed upon [an individual] through a restraint on his personal liberty." *Kitzman–Kelley v.

Warner*, 203 F.3d 454, 458 (7th Cir.2000).  "When a state actor ... deprives a person of his ability

to care for himself by incarcerating him, detaining him, or involuntarily committing him, it

assumes an obligation to provide some minimum level of well-being and safety." *Collignon v.

Milwaukee County*, 163 F.3d 982, 987 (7th Cir.1998).  Indiana has determined that "[w]hen a

party is in the custodial care of another ... the custodian has the duty to exercise reasonable care

to preserve the life, health, and safety of the person in custody.  The appropriate precautions will

vary according to the facts and circumstances presented in each case." *Sauders v. Cnty. of

Steuben*, 693 N.E.2d 16, 18 (Ind. 1998).

    Dr. Gwin "agree[d] with Dr. Nichols that Mr. Shinneman received his injuries when

being placed into the van as described by Deputy Monday." [Filing No. 128-3 at 8. (Gwin Report

p. 7)].  Dr. Gwin concluded, "Mr. Shinneman's cervical injuries were due to neck flexion" and

"Deputy Monday … provided the neck flexion." [Filing No. 128-3 at 8. (Gwin Report, p. 7)].

Mr. Shinneman's experts dispute Dr. Gwin's theory of the mechanism by which his injury

occurred, but *all* experts agree that the injury occurred after Mr. Shinneman was under arrest and

in the custody and control of law enforcement. [Filing No. 128-1 at 6. (Nichols Dec., Ex. 1, p. 3);

Filing No. 128-2 at 13. (Van Ee Dec., Ex. 1, p. 10); Filing No.128-3 at 8. (Gwin Report p. 7)].

As such, the IMPD Defendants had a constitutional duty to exercise reasonable care to preserve

Mr. Shinneman's life, health, and safety.

A.     **Monell Claims**

The Seventh Circuit determined in *Daniel v. Cook Cty.* that a defendant can be found

liable under §1983 and *Monell*, if a plaintiff demonstrates that the defendants' "official policy,

widespread custom, or action by an official with policy-making authority was the 'moving force'

behind his constitutional injury."  *Daniel v. Cook Cty*., 833 F.3d 728, 734 (7th Cir. 2016), citing

*Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016), *City of Canton, Ohio v. Harris*, 489

U.S. 378, 379, 109 S. Ct. 1197, 1200, 103 L. Ed. 2d 412 (1989).  The critical question under

*Monell* is whether the action about which the plaintiff is complaining is one of the institution

itself, or is it merely one undertaken by a subordinate actor. *Id*.

To establish liability under §1983, the plaintiff must show that "(1) he suffered a

deprivation of a federal right; (2) as a result of either an express municipal policy, widespread

custom, or deliberate act of a decision-maker with final policy-making authority[], which (3) was

the proximate cause of his injury." *Bickel v. Sheriff of Whitley Cty.*, No. 1:08-CV-102-TS, 2010

WL 1258165, at *5 (N.D. Ind. Mar. 26, 2010), quoting *Ienco v. City of Chi.,* 286 F.3d 994, 998

(7th Cir.2002).

For liability to attach to under §1983, a plaintiff must show that "deliberate action

attributable to the municipality directly caused a deprivation of federal rights." *Taylor-Hudgins*

*v. Spurgeon*, No. 1:02-CV-1130-LJM-WTL, 2004 WL 828093, at *5 (S.D. Ind. Mar. 3, 2004),

quoting *Frake v. City of Chi*., 210 F.3d 779, 781 (7th Cir.2000).  The plaintiff must establish that

municipal policymakers made a "deliberate choice" among various alternatives and that the

injury was caused by the policy. *Id*.  A municipality violates the Constitution when it has an

unconstitutional custom or policy. *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir.

2000).  "A 'custom' or 'policy' can take one of three forms: (1) an express policy that, when

16

enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority." *Id*.

At the time Mr. Shinneman filed his initial Complaint [Dkt. 1] on August 8, 2021, and his Amended Complaint [Dkt. 63] allowed by Court Order [Dkt. 69] on April 4, 2022, he was aware that IMPD and MCSO had entered into an agreement whereby all prisoners were to be transported by MCSO jail wagons. This agreement was codified by IMPD G.O. 8.1, and later learned through discovery by MCSO G.O. 16.3. The two read virtually identical in all relevant parts. [Filing No. 128-5. (MCSO G.O. 16.3); Filing No. 128-4. (IMPD G.O. 8.1)]. These general orders did not just affect Mr. Shinneman; rather, they applied to all arrestees in Indianapolis-Marion County. Because Indianapolis-Marion County is a consolidated city and the Marion County Sheriff's Office is a separate governmental entity, in order for MCSO to be bound to transport IMPD arrestees, MCSO had to agree to contract for those services. Mr. Shinneman contends that but for this contract, he would have been transported by IMPD in a police vehicle secured by a seatbelt as required by IMPD G.O. 8.1§I(B)(1)(b).

Mr. Shinneman's Amended Complaint identifies Defendant, Indianapolis-Marion County City-County Council as a municipal corporation established to govern the collective local and county governments of Indianapolis and Marion County, Indiana and operates and governs the IMPD pursuant to the laws of Indianapolis and the State of Indiana. Dkt. 63, p. 3, ¶ 7 Page ID# 483. City-County Council acts through its agents, employees and servants, including but not limited to Mayor Joe Hogsett, who was mayor at all times relevant herein. *Id*.

In 1969, the Indiana General Assembly enacted what is commonly referred to as the

"Unigov" Act, 1969 Ind. Acts ch. 173. *Peterson v. Borst*, 786 N.E.2d 668, 669 (Ind. 2003).

> [T]he Act provides that the Mayor is to be the chief executive and administrative officer of the consolidated city with the power to supervise the work of its departments, special taxing districts and special service districts. A twenty-nine (29) member City–County Council is also provided for which is to operate as the primary legislative body of the consolidated city and county. Its powers ... include generally the power to adopt budgets, levy taxes, make appropriations and adopt resolutions or ordinances necessary to the exercise of such powers.
> *Peterson,* 786 N.E.2d at 669.

City-County Defendants argue that the Executive Branch, not the City-County Council,

create policy for the IMPD and that no policy, practice, or procedure of the City-County Council

was the moving force behind any injury to Mr. Shinneman. This appears to be an example of a

misnomer. Under Indiana law, the court may order parties dropped or added at any stage of the

action and on such terms as are just and will avoid delay. Any claim against a party may be

severed and separately proceeded. Incorrect names and misnomers may be corrected by

amendment under Rule 15 at any time. Ind. R. Trial P. 21. Whenever the claim or defense

asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or

attempted to be set forth in the original pleading, the amendment relates back to the date of the

original pleading. Fed. R. Civ. P. 15. Amendment with relation back is generally allowed in

order to correct a misnomer of defendant where the proper defendant is already in court and the

effect is merely to correct the name under which he is sued. *Simmons v. Fenton*, 480 F.2d 133,

137 (7th Cir. 1973).

The Amended Complaint identifies Mayor Hogsett as "the chief executive and has the

duty to oversee the city-county government's various departments, agencies, and municipal

corporations, including but not limited to IMPD." Dkt. 63, p. 12, ¶ 64 Page ID# 492. As the

chief executive, Mayor Hogsett has final policy making authority by virtue of his power to either

approve or veto bills passed by the Indianapolis City-County Council. Dkt. 63, p. 12, ¶ 65 Page ID# 492.  Mr. Shinneman contends that the City-County Defendants through its agents, employees and servants, including Mayor Hogsett, was, at all times relevant, the final policymaker for the IMPD, and in that capacity developed, promulgated, implemented and maintained General Orders, policies, procedures, customs, and/or practices for the IMPD. Dkt. 63, p. 16, ¶ 90, Page ID# 496.

In his claim for relief against the City-County Defendants pursuant to §1983, Mr. Shinneman contends that it was aware through its agents, employees and servants, including Mayor Hogsett, of the rights guaranteed to him by the Fourth Amendment as identified in his Amended Complaint. Dkt. 63, p. 15, ¶ 86 Page ID# 495; p. 16, ¶ 89 Page ID# 496.

City-County Defendants contend that if Mr. Shinneman is able to pursue a *Monell* claim against them, the failure to provide seatbelts does not, by itself, constitute a substantial risk of harm rising to a constitutional violation. Dkt. 118, p. 18, Page ID# 1478.  In its August 1, 2022, Order, this Court determined that "[b]ecause Mr. Shinneman's claims are governed by the Fourth Amendment's objective reasonableness standard, *Dale* does not foreclose a Fourth Amendment violation when an officer fails to seatbelt an arrestee." Dkt. 107, p. 4Page ID# 822, citing *Dale v. Agresta*, 771 F. App'x 659 (7th Cir. 2019).  In its responses to Mr. Shinneman's Requests for Admissions, the City-County Defendants admitted:

**Request No. 4:**

Admit that there is a risk of bodily injury of any severity including death when an individual riding in a motor vehicle is unrestrained or otherwise unprotected by any safety feature, including but not limited to a seatbelt.

**Response:** Admit.
Filing No. 128-31 at 3. (City-County Resp. R of A, Req No. 4)].

Both MCSO and Monday made the same admission. [Filing No. 128-14 at 3. (MCSO Resp. R of A, Req No. 5); Filing No. 128-15 at 3-4. (Monday Resp. R of A, Req No. 6)]. That admission is evidence of City-County Defendants' clear recognition that unsecured individuals travelling in the rear of a jail wagon are at risk of serious bodily injury. In this case, Mr. Shinneman suffered a spinal cord injury and, at age 48, became a quadriplegic. Thus, applying the *Graham* objectively reasonableness standard, City-County Defendants and Defendant MCSO knew that there was a "risk of bodily injury of any severity including death when an individual riding in a motor vehicle is unrestrained or otherwise unprotected by any safety feature, including but not limited to a seatbelt." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). And yet, City-County Defendants continued to contract for MCSO to transport all arrestees taken to the Marion County Jail in wagons which did not contain restraints. IMPD G.O. 8.1 did not allow for any exceptions or discretion on the part of IMPD officers in the field. It did not provide officers with the ability to consider other forms of transportation for individuals who clearly appeared intoxicated or otherwise impaired to the point that they could be at risk of serious bodily harm if transported in an MCSO wagon. Linares testified that Mr. Shinneman was "just so – so intoxicated" that the IMPD officers did not want him standing while waiting for the MCSO wagon for fear he would fall. [Filing No. 128-9 at 8. (Linares Stmt. 6:5-6)]. The fact that IMPD G.O. 8.1 does not provide IMPD officers discretion with regard to transport options when faced with an individual who is fall-down drunk such that there is potential risk of physical harm evidences a policy consideration that is not objective reasonable.

The IMPD officers should have intervened and requested EMS transport. A reasonable jury could find, based on the foregoing, that City-County Defendants maintained a policy of delegating the transport of detainees to MCSO despite knowing that MCSO transport vehicles

lacked seatbelts or other safety restraints, which was the moving force behind his constitutional injury.  For the forgoing reasons, the City-County Defendants' motion for summary judgment should be denied.

**B.      IMPD Officers Brink, Brown, Linares and Smith did not act reasonably at all times regarding Mr. Shinneman.**

### 1.      Excessive Force

Claims of excessive force, when made in the context of an arrest, are reviewed under the Fourth Amendment's objective-reasonableness standard.  *Graham*, 490 U.S. at 395; *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005).  In conducting this examination, the court looks at the "totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000).  The analysis considers the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others and whether they are actively resisting arrest or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396.

Circuits, including the Seventh, have determined that the *Graham* reasonableness inquiry (balancing an individual's liberty with the government's interest in the application of force) nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom.  *Abdullahi*, 423 F.3d at 773, see also *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).  In those cases, the Circuits have held that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. *Id*.

Using the summary judgment standard to consider the facts in the light most favorable to the non-moving party, the IMPD Defendants simply cannot carry their burden to prove that no

genuine issue as to any material fact exists regarding whether excessive force was used when Mr. Shinneman's was being loaded into the transport wagon.

IMPD Defendants state that it is undisputed that no one threw Mr. Shinneman into the van head-first. That is not true. Though he has no present recollection, Mr. Shinneman was interviewed twice in close proximity of time to the injury in which he recalled that very thing. On September 11, 2019, Mr. Shinneman told Lt. Knight, they "threw me in there." [Filing No. 128-24 at 6. (Shinneman Dec., Ex. 1, 2:49)]. He further recalled "I wasn't fast enough for them … so they literally picked me up one on each side of me and threw me in there." [Filing No. 128-24 at 6. (Shinneman Dec., Ex. 1, 2:47-49)].

During Mr. Shinneman's neuropsychological evaluation, the Hines' physician noted that Mr. Shinneman recalled being "roughly" tossed into the wagon. [Filing No. 128-26 at 6. (VAMC Hines)]. Further, his mother (Wolford) testified to Mr. Shinneman's lack of a "short-term memory" and his "brain damage from this; so …." [Filing No. 128-25 at 7. (Wolford Depo.), 43:1-5).]

Additionally, while it is undisputed that IMPD Defendants each gave declarations that none of them threw or assisted anyone throwing Mr. Shinneman into the wagon, both Monday and Mr. Shinneman give differing accounts. Monday testified, "[o]ne of them, I don't know who it was, he put some gloves on to help me put him in to get him to step up." [Filing No. 128-8 at (Monday Oral Stmt. 10:11-13)]. On September 11, 2019, Lt. Knight questioned Mr. Shinneman about IMPD officer involvement:

> Q1  Ok, as far as you can recall, did any Indianapolis Police Department Officer hit you, strike you, kick you, do you any harm, causing pain before you got into the jail wagon
> A1  Yes they, one was on my right one was on my left and they picked me up and threw me head first into the paddy wagon that he recalled being thrown in headfirst by two individuals, one on his left and one on his right.

22

[Filing No. 1228-24 at 6. (Shinneman Dec., Ex. 1, 2:41-44)].

As if repeating a misstatement of fact makes it true, City-County Defendants repeatedly claim that Dr. Van Ee did not believe that Mr. Shinneman's injuries occurred when he was "placed" in the wagon. Dkt. 118, p. 19 Page ID# 1479. That assertion is simply not true.

On September 8, 2019, Mr. Shinneman suffered a bilateral facet dislocation which resulted in his quadriplegia. Dr. Van Ee testified that Monday's claimed version of events – if believed – would not cause a bilateral facet dislocation, citing it was not biomechanically possible, especially considering Monday's assertion that he was not touching Mr. Shinneman when the alleged back somersault occurred and that he was standing outside of the wagon. [Filing No. 128-2 at 52-55. (Van Ee Dec., Ex. 2, 60:22-63:15)]. Dr. Van Ee explained a bilateral facet dislocation requires tremendous force/compression. [Filing No. 128-2 at 55. (Van Ee Dec., Ex. 2, 63:8-16)]. Clearly, City-County Defendant's did not review the entire transcript of Dr. Van Ee's testimony, he testified, "I think it's one of two things. Either it happened after the doors are shut, or it happened before and people haven't completely explained what occurred there." [Filing No. 128-2 at 56. (Van Ee Dec., Ex. 2 64:16-19)].

Mr. Shinneman has scientific and medical evidence which concluded that his injury occurred while he was in law enforcement custody. [Filing No. 128-1 at 6. (Nichols Dec.), Ex. 1, p. 3); Filing No. 128-2 at 13. (Van Ee Dec.), Ex. 1, p. 10); Filing No. 128-3 at 8. (Gwin Report) p. 7)]. In order to sustain an "acute ASIA A spinal cord injury with bilateral C6-7 jumped facets causing – 1 cm of anterolisthesis and severe spinal cord compression," Mr. Shinneman's body had to receive either tremendous momentum or compressing force. [Filing No. 128-23 at 3. (Esk. Hos. Rec., p. 39); Filing No. 128-2. (Van Ee Dec. Ex. 2)]. This is proven science, not simply Mr. Shinneman speculating.

As in *Abdullahi*, Mr. Shinneman "is not asking the finder of fact to speculate about the cause [of his injury] but rather is asking the fact finder to infer causation, logically, from undisputed facts and competent evidence." *Abdullahi*, 423 F.3d at 770–772. "Circumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable." *Abdullahi*, 423 F.3d at 772, citing *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir.2003). As the Court noted, "[s]uch inferences are often necessary when the plaintiff's sole eyewitness is dead." *Id*. In the case at bar, Mr. Shinneman has no present sense recollection. It is undisputed that Mr. Shinneman suffered a spinal cord injury while in law enforcement custody.

City-County Defendants argue that, even if evidence existed that someone threw Mr. Shinneman into the wagon, because he cannot identify the specific individual, his excessive force claim must fail. At multiple points in his statement, Smith acknowledges that he assisted Monday in getting Mr. Shinneman into the wagon. [Filing No. 128-10 at 13. (Smith Stmt. 11:20-25)].

As this Court noted in its August 1, 2022, Order, although Mr. Shinneman does not know who tossed him into the van, Deputy Monday was the only non-IMPD officer present, so presumably one of the IMPD officers assisted him. Dkt. 107, p. 3, Page ID# 821.

### 2. Failure to Intervene

As the Court noted in its August 1, 2022:

An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under §1983 if that officer had reason to know that other officers were committing a constitutional violation and he had a realistic opportunity to prevent the harm. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).
Dkt. 107, p. 4, Page ID# 822.

The Court held that, "Mr. Shinneman's allegations that one of the four IMPD officers participated in tossing him headfirst into the MCSO van while he was handcuffed, and that the

remaining officers failed to intervene, state[s] a viable Fourth Amendment claim.  A reasonable jury could conclude that it was objectively unreasonable to either participate or fail to intervene in this conduct." Dkt. 107, p. 4, Page ID# 822.

> Dr. Gwin concluded:
>
> Mr. Travis Shinneman's cervical injuries were due to *neck flexion*.  Deputy Monday's description of Mr. Shinneman attempting to raise his legs over his head in what appeared to be a back somersault provides an understanding of the injury mechanism.  When *Deputy Monday* reached into the wagon and rearranged the arrestee's legs by pushing him, that *provided the neck flexion*. (Emphasis added).
> [Filing No. 128-3 at 8. (Gwin Report p. 7)].

According to Monday, he reached into the wagon, grabbed Mr. Shinneman by his shoulders and laid him down.  [Filing No.128-8 at 13. (Monday Oral Stmt. p. 11:10-13)].

Mr. Shinneman and his experts reject both Dr. Gwin's conclusion and Monday's explanation of what occurred, but for the purposes of argument, it is logical that if Monday were standing outside the wagon manipulating Mr. Shinneman and all these officers are standing there watching, and Mr. Shinneman's neck were broken, they "would immediately know that something horrible just happened to that person" and that no one describes such an incident. Dkt. 118, p. 20, Page ID# 1480.  Again, Dr. Van Ee testified that if the injury occurred before the doors closed that "people haven't completely explained what occurred there."   [Filing No. 128-2 at 56. (Van Ee Dec., Ex. 2, 64:16-19)].

The takeaway from Dr. Van Ee's testimony is that it is possible the IMPD Defendants witnessed the horrible injury to Mr. Shinneman and have not completely explained what they saw.  As such, there remains a question of fact for the jury to decide whether the IMPD Defendants witnessed Mr. Shinneman's neck get broken and failed to intervene.

**C.    IMPD Officers Brink, Brown, Linares and Smith are not entitled to qualified immunity.**

Mr. Shinneman understands that in order to survive summary judgment on the issue of qualified immunity, he must establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018), see also *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Lovett v. Herbert*, 907 F.3d at 991, quoting *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015).

The very fact that the privilege is qualified reflects a recognition there is no societal interest in protecting those uses of a law enforcement officer's discretion that amount to reckless or callous indifference to the rights and safety of individuals in their charge.  *Smith v. Wade*, 461 U.S. at 55.  "Once the protected sphere of privilege is exceeded, we see no reason why state officers should not be liable for their reckless misconduct on the same basis as private tortfeasors." *Id.*

Mr. Shinneman's Amended Complaint sets forth that he possessed the following clearly established rights at the time of the complained of conduct:

> a. the right to be secure in his person from unreasonable seizure through excessive force, under the Fourth and Fourteenth Amendments, and
>
> b. the right to bodily integrity and to be free from cruel and unusual punishment and excessive force by law enforcement under the Fourteenth Amendment.
> [Dkt. 63, ¶ 86, Page ID# 495.]

He is sufficiently specific as to his rights that were violated – to be secure in his person, the right to bodily integrity and free from excessive force, all as afforded him by the Fourth Amendment.

26

The Fourth Amendment to the United States Constitution states in pertinent part, "[t]he right of the people to be secure in their persons. . . . against unreasonable searches and seizures, shall not be violated . . .."  It is also well established that excessive force claims arising during the arrest or investigatory stop of a free citizen, are "most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable. . . seizures' of the person." *Graham*, 490 U.S. at 394.  "A right is 'clearly established' when it is ''sufficiently clear that every reasonable official would have understood that what he is doing violates that right.''" *Lovett*, 907 F.3d at 992, citing *Mullenix*, 136 S.Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)).

Applying the *Ashcroft v. al-Kidd* test, any reasonable officer knows that the use of excessive force violates the clearly identified Fourth Amendment rights to be free from unreasonable seizure and bodily integrity.  These rights have been established, maintained and defended since the Fourth Amendment was ratified and went into effect on December 15, 1791.

*Abdullahi* is on point as it directly addressed the issue of qualified immunity in the context of the failure to intervene.  Officers sought qualified immunity from an allegation of failure to intervene when they witnessed a fellow officer engage in conduct the nature of which may have violated an arrestee's constitutional rights.  *Abdullahi*, 423 F.3d at 774-775.

While the City-County Defendants offer the following, they ignore *Yang*:

Courts have struggled with the contours of excessive force and failure to protect claims for years, and there are not always clear standards for when something is or is not excessive force. While the Supreme Court and the Seventh Circuit have laid out some boundaries and guidelines for what constitutes excessive force or a failure to intervene, there are no bright line rules. [Dkt. 118, p.22, Page ID#1482.]

27

*Yang* established the test to determine whether an officer who fails to intervene when he witnesses another officer using excessive force can be liable under §1983. *Yang v. Hardin*, 37 F.3d at 285.  This is precisely the test this Court expressed in its Order of August 1, 2022. Dkt. 107, p. 4, Page ID# 822.  The Seventh Circuit determined that "the prongs of this analysis almost always implicate questions of fact for the jury: 'Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Abdullahi*, 423 F.3d at 773–74, citing *Lanigan v. Village of East Hazel Crest*, Ill., 110 F.3d 467, 478 (7th Cir.1997).

The City-County Defendants argue that "there is no closely analogous case which would show City Defendants' actions during the arrest of Mr. Shinneman were unconstitutional, particularly in light of the fact that not one person on the scene saw any excessive force being used." Dkt. 118, page 22, Page ID#: 1482.  That is not true.  The facts in this case fall seamlessly into *Abdullahi*.

> Since the very nature of [Monday's] conduct remains undetermined, one can only speculate as to how visually obvious any violation of [Shinneman's] rights might have been.  In other words, without knowing what [Monday] did or how his conduct appeared to onlookers, it would be difficult to say that, as a matter of law, a reasonable officer could not have known that [Monday's] conduct violated [Shinneman's] constitutional rights.  A jury should decide whether [Monday's] actions would have made it clear to a reasonable officer that intervention was warranted, and, if so, whether [Brink, Brown, Linares and Smith] had a realistic opportunity to intervene.
> *Abdullahi*, 423 F.3d at 775.

Also, as in *Abdullahi*, the City-County Defendants also place special importance on the fact that no eyewitness to the arrest reported seeing anyone hit, slap or strike Mr. Shinneman. *Id.,* at 771.  The Court noted that "[t]he number of witnesses for each party is not dispositive at trial, let alone on summary judgment." *Id*. at 772.

28

For the foregoing reasons, the City-County Defendants' motion for summary judgment on the issue of qualified immunity should be denied and should be determined by a jury after a review of all the facts presented at the trial of this matter.

### IV.    Conclusion

For all of the reasons set forth in Mr. Shinneman's Response to City-County Defendants' Motion for Summary Judgment, there exists sufficient questions of fact which prohibit the granting of Defendants' motion.

WHEREFORE, Mr. Shinneman prays that this Honorable Court deny the City- County Defendants' Motion for Summary Judgment and set this matter for trial.

Respectfully Submitted:

Date:  October 20, 2022

*/s/ J. Clayton Culotta*
J. Clayton Culotta, #26733-11
clay@culottalaw.com

*/s/ Jennifer H. Culotta*
Jennifer H. Culotta, #26741-11
jennifer@culottalaw.com

*I hereby certify that on the 20th day of October 2022, a copy of the foregoing*
*was served electronically on all counsel of record via the Court's electronic filing system.*
*/s/ J. Clayton Culotta*